[Cite as *State v. Pullin*, 2016-Ohio-1179.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
| --- | --- | --- |
| STATE OF OHIO | : | Hon Sheila G. Farmer, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2015CA00134 |
| KIP MARESE PULLIN | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal appeal from the Stark County
                              Court of Common Pleas, Case No.
                              2015CR0042(B)


JUDGMENT:                     Affirmed


DATE OF JUDGMENT ENTRY:       March 21, 2016


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

JOHN D. FERRERO                           BERNARD HUNT
BY RONALD MARK CALDWELL                   2395 McGinty Road N.W.
STARK COUNTY PROSECUTOR                   North Canton, OH 44720
110 Central Plaza S.
Canton, OH  44702

*Gwin, J.*

**{¶1}**  Appellant Kip Marese Pullin was convicted after a jury trial in the Stark County Court of Common Pleas of one count of attempted murder, with a firearm specification, one count of felonious assault with a firearm specification, and one count of carrying concealed weapons.

*Facts and Procedural History*

**{¶2}**  On December 22, 2014, Craig McCoy was living with Charles Benjamin at 902 Johnson Street located in Massillon, Ohio.  He originally moved in about mid-November.  Chelsea Smith moved into the home in mid-December with her three children, ages 10, 3 and 1.  McCoy slept downstairs while the others slept upstairs.

**{¶3}**  McCoy knew appellant's father, Kip A. Pullin, by sight.  McCoy knew "Big Kip" since 1990.  McCoy also knew "Little Kip," the appellant.

**{¶4}**  On December 21, 2014, McCoy had gone to sleep downstairs.  He was suddenly awakened around seven o'clock the next morning when he heard the back door to the residence "bust open."  As McCoy got up to see what was going on, appellant, who was wearing a hoodie, met him.  McCoy did not recognize appellant right away as he was immediately shot by him and was wounded in his right arm.  McCoy nonetheless ran towards appellant, grabbed him, and threw him to the ground.  McCoy then struggled with appellant trying to get the handgun away from him.  As he was fighting, McCoy realized that his assailant was appellant.  McCoy then realized that someone else was shooting at him from behind.  In order to protect himself, McCoy tried to use appellant as a shield.  Many bullets were now being fired at him, and it was during this time that McCoy now

realized that Big Kip was firing his handgun at him. McCoy also saw a third assailant, but he did not know him, only seeing that this third man had a lump on his eye.

{¶5} Little Kip approached McCoy who was lying on the floor and shot him in the face. McCoy also suffered from gunshot wounds to his side and his leg, as well as the shots to his right arm. Leaving McCoy in a pool of his own blood, the three men then ran out of the house.

{¶6} Massillon Police Officer James Slutz arrived at the residence in response to a 9-1-1 call. He was met by Charles Benjamin at the front door and was told that someone had been shot in his home. Officer Slutz found McCoy lying on the living room floor with Chelsea Smith tending to him. Officer Slutz asked McCoy who had shot him, and McCoy replied that he did not know. Officer Slutz noticed that McCoy was in pain and was holding his face. Officer Slutz also asked Smith who had done the shooting, and she replied that they did not know. Both McCoy and Smith were short and brief with Officer Slutz. Massillon Police Detective David McConnell soon arrived at the scene and attempted to interview Benjamin, Smith, and McCoy. Smith appeared very nervous and frightened, and was not providing McConnell with much information. The detective noticed that Benjamin, who was also very nervous and secretive, was whispering with Smith. McCoy also did not identify any of the shooters for McConnell. Other Massillon police officers noticed that Smith was passive and rather quiet, while Benjamin was erratic, upset, and agitated.

{¶7} McCoy admitted at trial that he did not tell Detective McConnell who had shot him while he was at the scene. McCoy explained that he was in shock because of what had just happened to him, and it all seemed like a dream to him. He was in shock

that he had been shot and was now seriously wounded. Once the paramedics arrived, McCoy was immediately taken to the hospital. Detective McConnell eventually followed McCoy to the hospital, where he attempted to speak with McCoy. McCoy did not offer who had shot him at this time. McConnell left his business card with McCoy's son, and told him to have his father contact him when he was in better condition to talk.

{¶8} The Massillon police processed the crime scene that day, taking photographs of the scene and of the evidence recovered. This evidence included spent shell casings and bullets, some of which were .25 caliber. A search of the house turned up no weapons.

{¶9} McCoy was subsequently discharged on Christmas Day from the hospital after being treated for his numerous gunshot wounds so that he could be home with his children. McCoy went back to the same residence and had Smith contact McConnell the next day. When McConnell arrived, McCoy told the detective that two of the three men who barged into the home and shot him were the Pullins. With this information, McConnell obtained arrest warrants for both men for the shooting.

{¶10} Later that day, McCoy received a phone call from Benjamin's sister (Candice Benjamin), who lived in the neighborhood, as did the Pullins. Upon receiving this phone call, McCoy immediately called McConnell and told him that the Pullins were walking in the neighborhood near Walnut and 14th Streets. McConnell immediately relayed this information over the radio, and Officer Slutz, who was on routine patrol at this time, received this dispatch call. Officer Slutz knew that both men had been developed as suspects in the shooting of McCoy and that were there now warrants for their arrest. As other police approached, Big Kip immediately surrendered. He was placed under

arrest and a loaded .357 Magnum semiautomatic handgun was recovered from his waistband. Appellant, however, fled the scene and a chase ensued. Officer Sean Dadisman chased appellant through the neighborhood, losing him briefly after he jumped over a security fence. Before reaching this fence, Officer Dadisman saw appellant throwing things away, which were later recovered and determined to be his cap, an aerosol can containing cash and drug paraphernalia, and a .45 caliber handgun. After getting around the fence, Officer Dadisman resumed the chase, eventually losing sight of him as appellant ran between houses. Officer Joshua Edwards was searching the neighborhood for appellant when he saw him walking towards him. Officer Edwards ordered appellant to stop, but he replied that he had already talked with the police in the area and that he was good. Appellant continued walking and Officer Edwards emphatically ordered him to stop. Upon doing so, appellant was placed under arrest.

{¶11} Appellant's cousin, Marquez Smith, also lived in this neighborhood and spotted the Pullins walking together. Smith had talked to appellant a couple days earlier, after the shooting, and notice that he had a scratch on his nose. Smith asked his cousin about it, and appellant responded that he got scratch while wrestling with someone. After this conversation, Smith later talked with appellant on the phone, and appellant told Smith that he had shot McCoy. Smith was not sure if his cousin was just joking, but he nonetheless knew that the police were searching for appellant. Thus, when he noticed the Pullins walking and the police presence in the neighborhood, Smith opted to go into his house, as he did not want any trouble with the police. About fifteen minutes later, appellant banged on his door, asking to be let him. Again, because of his own legal troubles, Smith did not want to get involved so he refused to open the door. He relented,

however, and gave appellant different clothes to wear. Appellant changed into those clothes, leaving his pants on the porch. After appellant left, Smith eventually went outside onto his porch, and found a .25 caliber handgun in a pocket of appellant's pants. He traded the gun to Philip Bledsoe in exchange for drugs.

{¶12} Later that night, Detective McConnell received another phone call from McCoy. This time, McCoy told the detective that Philip Bledsoe had come into possession of the gun that appellant used during the shooting. McConnell told him he would come there to retrieve it first thing next morning. When Detective McConnell arrived the next morning, McCoy was not home. Charles Benjamin, however, gave the .25 caliber Ravens Arms handgun to the detective.

{¶13} In addition, a ballistics expert from the Ohio Bureau of Criminal Identification & Investigation compared cartridges and bullets retrieved from the scene and McCoy. This expert could not confirm or deny that the recovered cartridges were fired from the recovered .25 caliber handgun, mainly because of the particular characteristics of this cheap handgun, which make comparison difficult. The expert, however, was able to conclude within a reasonable degree of scientific certainty that two of the fired bullets that were recovered were fired from this handgun to the exclusion of all other handguns in the world.

{¶14} Chelsea Smith testified at trial that she was awakened that morning with the noise from the back door, followed shortly by gunshots. After the fight was over, she looked outside of her upstairs bedroom window and saw appellant and two other men running away from the back door. One of these two other men could have been Big Kip. Smith admitted that she did not initially tell the police this information out of fear. However, once McCoy

was released from the hospital, she opted to cooperate. After the Pullins were arrested, Smith and McCoy left the home for their own safety.

{¶15} Appellant did not testify at trial. He did, however, have a cousin, Alicia Austin, testify. Austin asserted that appellant came to her house the night before the shooting and was sick with the flu. She allowed him to sleep over since her entire family was sick at the time. The next morning, the morning of the shooting, Austin testified that appellant woke her up shortly before noon to tell her that he was leaving and would be staying either at his father's or at a friend's.

{¶16} The jury found appellant guilty. The trial court sentenced appellant on the charge of attempted murder to 10 years. On the firearm specification, appellant was sentenced to 3 years consecutive. The trial court merged the felonious assault charge with the attempted murder charge, and the firearm specification was merged with the previous firearm specification. The trial court sentenced appellant on the carrying concealed weapon charge to 12 months, consecutive, resulting in an aggregate sentence of 14 years.

*Assignments of Error*

{¶17} Appellant raises three assignments of error,

{¶18} "I. THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION TO DISMISS UNDER CRIMINAL RULE 29 (A).

{¶19} "II. THE JURY VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

{¶20} "III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED THE APPELLANT'S CRIMINAL RULE 33, MOTION FOR A NEW TRIAL BASED UPON THE FAILURE TO PROVIDE DISCOVERY."

I. & II.

{¶21} Appellant's first and second assignments of error raise common and interrelated issues; therefore, we will address the arguments together.

{¶22} In his first assignment of error, appellant alleges that the trial court erred in not granting his Crim. R. 29 motion for acquittal. In determining whether a trial court erred in overruling an appellant's motion for judgment of acquittal, the reviewing court focuses on the sufficiency of the evidence. See, *e.g., State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965(1995); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492(1991), *superseded by State constitutional amendment on other grounds in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668(1997). In his second assignment of error, appellant contends his conviction is against the manifest weight of the evidence produced by the state at trial.

{¶23} Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶68.

{¶24} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue, which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541, *quoting* Black's Law Dictionary (6th Ed. 1990) at 1594.

{¶25} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting testimony. Id. at 387, 678 N.E.2d 541, *quoting Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721 (1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id.

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

{¶26} *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶27} In the case at bar, there is no dispute that McCoy was shot with a handgun five times and suffered serious physical harm. (1T. at 157-158). Accordingly, the state presented sufficient evidence that the victim suffered "serious physical harm." R.C. 2901.01(A) (5). Further, the state presented sufficient evidence that a "firearm" was used during the commission of the offenses. R.C. 2923.11; R.C. 2941.145. Appellant's main argument is that there was insufficient evidence to identify him as the assailant in the shooting of McCoy. He argues that the evidence presented at trial was insufficient because there were no fingerprints, DNA, or other physical evidence that linked appellant to the crimes, and that witnesses changed their stories.

{¶28} In the case at bar, McCoy testified that appellant shot him. (1T. at 151-155). Marques Smith testified that appellant admitted to shooting McCoy. (1T. at 192).

Appellant asked Smith for a change of clothes and left the .25 caliber handgun on Smith's porch with his clothing. (1T. at 196-197). Evidence was presented during appellant's jury trial that two of the fired .25 caliber bullets found at the home on the night of the attack were fired from this gun. (2T. at 391-392). Officer Sean Dadisman chased appellant and observed him throw a loaded .45 caliber handgun from his person. (1T. at 260; 272-273).

{¶29} A conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony. *State v. Morris*, 10th Dist. No. 05AP–1139, 2009–Ohio–2396, ¶33. The jury heard all of the evidence and chose to believe the victim's version of events over appellant's version. This was within the province of the jury. Id., *citing State v. Lee*, 10th Dist. No. 06AP–226, 2006–Ohio–5951, ¶ 14.

{¶30} Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant committed the crimes of attempted murder, felonious assault and carrying a concealed weapon. We hold, therefore, that the state met its burden of production regarding each element of the crimes, and accordingly, there was sufficient evidence to support appellant's convictions.

{¶31} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA–5758, 1982 WL 2911(Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest

weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g., In re Brown*, 9th Dist. No. 21004, 2002–Ohio–3405, ¶ 9, *citing State v. DeHass*, 10 Ohio St .2d 230, 227 N.E.2d 212(1967).

{¶32} Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist. 1999).

{¶33} The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967),

paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

{¶34} The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks, supra.*

{¶35} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost his way nor created a miscarriage of justice in convicting appellant of the charges.

{¶36} Based upon the foregoing and the entire record in this matter, we find appellant's convictions are not against the sufficiency or the manifest weight of the

evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses and appellant's witnesses. This court will not disturb the trier of facts finding so long as competent evidence was present to support it. *State v. Walker*, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of appellant's guilt.

**{¶37}** Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes of attempted murder, felonious assault and carrying a concealed weapon beyond a reasonable doubt.

**{¶38}** Appellant's first and second assignments of error are overruled.

III.

**{¶39}** In his third assignment of error appellant challenges the failure of the trial court to grant a mistrial because of alleged discovery violations by the state.

**{¶40}** During the first day of trial, Massillon Police Officer Sean Dadisman testified about his chase of appellant when appellant and his father were confronted by police four days after the shooting. During this chase, Dadisman saw appellant throw things, which Dadisman later recovered. On cross-examination, Dadisman was asked if these items were photographed before being recovered. He answered that they had been. (1T.at 276). On redirect, he was asked where these photographs were located. Dadisman explained that such photos are stored on a computer, but that when he went to look at the allegedly stored photos, he could not find them. He even searched unsuccessfully in

miscellaneous files, but could not locate the missing photos.  (1T.at 279).  Appellant did not immediately object or move for a mistrial.

{¶41}  In this case, the photographs of the items recovered during the police chase of appellant were apparently not saved on the Massillon Police Department computer.  The items themselves, however, were recovered and presented at trial.  The prosecution cannot disclose and turn over to the defense what it does not have, thus there was no discovery violation.  Furthermore, appellant was free to argue this police mishap to the jury and how this may have somehow tainted the investigation.  Appellant did not do so, or move for a mistrial.

{¶42}  Appellant argues that the state "did have exculpatory evidence...that was not turned over at trial."  Appellant's Brief at 19.

{¶43}  Depending on the nature of the evidence, different tests are applied to determine whether the state's failure to preserve evidence amounts to the level of a due process violation.  *State v. Powell*, 132 Ohio St.3d 233, 2012 Ohio 2577, ¶ 73-77, 971 N.E.2d 865.  The state's failure to preserve 'materially exculpatory' evidence, regardless of whether such failure was done in good faith or bad faith, violates due process.  *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L. Ed. 2d 413 (1984).  "Evidence is constitutionally material when it possesses 'an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'"  *Powell* at ¶ 74, *quoting Trombetta* at 489.  The defendant bears the burden to show that the evidence was materially exculpatory.  *Powell* at ¶ 74.  *See State v. Powers*, 12th Dist.

No. CA2004-12-110, 2005 Ohio 4340, ¶ 15 (noting that burden shifts to state when defendant requests preservation of evidence prior to evidence's destruction).

**{¶44}** However, a different rule is used when the evidence is merely "potentially useful." *State v. Geeslin*, 116 Ohio St.3d 252, 2007 Ohio 5239 at ¶ 9-10, 878 N.E.2d 1. "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L. Ed. 2d 281 (1988). Bad faith implies more than bad judgment or negligence, rather "[i]t imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Powell* at ¶ 81.

**{¶45}** We find that appellant's due process rights were not violated when the state failed to preserve the photographs. The pictures would not provide exculpatory evidence. Testimony was presented that Officer Dadisman observed appellant discard items as he ran from the police four days after the shooting. A search of the area found the items, specifically a cap, an aerosol can containing cash and drug paraphernalia, and a .45 caliber handgun. The actual items were presented in court.

**{¶46}** Even assuming that pictures of the area or the items would be potentially useful, appellant has failed to point to any evidence to show how it was destroyed in bad faith.

**{¶47}** Thus, the trial court did not err in failing to grant a motion for a new trial.

**{¶48}** Appellant next contends that the state on the second day of trial disclosed to the defense a police report concerning Marquez Smith, who had already testified. In this report, Smith is reported to have told the police that he traded the .25 caliber handgun

he found on his porch to Philip Bledsoe for drugs. The prosecutor represented to the trial court that he only knew that Smith had given the gun to Bledsoe, but did not know that the quid pro quo was drugs. In preparing for that day's testimony, the prosecutor talked with Detective McConnell, and asked him on a whim if he knew why Smith gave the gun to Bledsoe. McConnell told the prosecutor that he had talked with Smith when he got out of jail, and Smith told him about the trade for drugs, at which time he prepared a supplement. Upon learning of this information that morning, the prosecutor immediately disclosed this information to the defense and gave a copy of the report to the defense. The prosecutor then offered to stipulate to this fact. 2T. at 312-316. The defense responded, however, by moving for a mistrial, arguing that the evidence was exculpatory. 2T.at 316-317. Upon inquiry from the court, the prosecutor replied that he would locate Marquez Smith and produce him for further cross-examination. 2T .at 320, 327. The trial court then overruled the mistrial motion, reading into the record the police report. 2T.at 323-326.

{¶49} Defense counsel then conferred with appellant, after which he told the court "he does not want me to have Marquez Smith back on the stand." 2T.at 329-330. Defense counsel stated that appellant was satisfied with the strategy that they were already pursuing, which the court confirmed with appellant. 2T.at 332. Defense counsel specifically did not want the detective to testify about anything in this report. 2T.at 333.

{¶50} In the case at bar, appellant led the trial judge to believe that he was withdrawing his motion for a mistrial. Appellant rejected the opportunity to correct the error before the jury was charged. (2T. at 332-333).

{¶51} The general rule is that "an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Childs*, 14 Ohio St. 2d 56, 236 N.E. 2d 545(1968), paragraph three of the syllabus; *State v. Glaros*, 170 Ohio St. 471, 166 N.E.2d 379(1960), paragraph one of the syllabus; *State v. Lancaster*, 25 Ohio St.2d 83], 267 N.E.2d 291(1971), paragraph one of the syllabus; *State v. Williams*, 51 Ohio St.2d 112, 117, 364 N.E.2d 1364(1977). Likewise, "[c]onstitutional rights may be lost as finally as any others by a failure to assert them at the proper time." *State v. Childs,* supra, 14 Ohio St. 2d at 62, 236 N.E. 2d 545, *citing State v. Davis* (1964), 1 Ohio St.2d 28, 203 N.E.2d 357(1964); *State, ex rel. Specht, v. Bd. of Edn.*, 66 Ohio St.2d 178, 182, 420 N.E.2d 1004(1981), *citing Clarington v. Althar*, 122 Ohio St. 608, 174 N.E. 251(1930), and *Toledo v. Gfell* (1958), 107 Ohio App. 93, 95, 156 N.E.2d 752(6th Dist. 1958). *See also, State v. Chandler*, 157 Ohio App.3d 72, 813 N.E.2d 65, 2004-Ohio-3436(5th Dist.), ¶ 72; *State v. Hughett*, 5th Dist. Delaware No. 04 CAA 06051, 2004-Ohio-6207, ¶58.

{¶52} As the United States Supreme Court observed in *Puckett v. United States*, 556 U.S. 129, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266(2009),

If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. There is good reason for this; 'anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by

appellate courts to reverse because of unpreserved error would be fatal.'"

(Citation omitted).

*Puckett*, 556 U.S. at 143,

{¶53} "[A]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus* (May 24, 2010), 560 U.S. __, 130 S.Ct. 2159, 2010 WL 2025203 at 4. (Internal quotation marks and citations omitted).

{¶54} In the case at bar, appellant made a calculated decision after conferring with his attorney to forgo the remedy offered by the trial court. It is disingenuous for appellant to now argue that the state should have disregarded his and his attorney's wishes, and instead, sua sponte ordered a mistrial. The trial court specifically found that the state did not act intentionally or in bad faith concerning the failure to disclose. (2T. at 330).

{¶55} Accordingly, the trial court did not did not abuse its discretion in overruling the motion for a mistrial.

{¶56} Appellant's third assignment of error is overruled.

{¶57} For the foregoing reasons, the judgment of the Stark County Court of Common Pleas, Stark County, Ohio is affirmed.

By Gwin, J.,

Farmer, P.J.,

Delaney, J., concur