[Cite as *State v. Pullin*, 2018-Ohio-4393.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. W. Scott Gwin, P.J |
| Plaintiff – Appellee | Hon. William B. Hoffman, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2018CA00021 |
| KIP MARESE PULLIN | |
| | |
| Defendant – Appellant | O P I N IO N |


CHARACTER OF PROCEEDINGS:     Appeal from the Stark County Court of
Common Pleas, Case No. 2015-CR-
0042(B)


JUDGMENT:     Affirmed


DATE OF JUDGEMENT ENTRY:     October 29, 2018


APPEARANCES:


For Plaintiff-Appellee                          For Defendant-Appellant

JOHN D. FERRERO                            KIP MARESE PULLIN, pro se
Prosecuting Attorney                          Inmate No. A641-409
Stark County, Ohio                             Richland Correctional Institution
                                                      P.O. Box 8107
RONALD MARK CALDWELL                 Mansfield, OH  44901
Assistant Prosecuting Attorney
110 Central Plaza, South – Suite 510
Canton, OH  44702-1413

*Hoffman, J.*

{¶1}   Appellant Kip Marese Pullin appeals the judgment entered by the Stark County Common Pleas Court overruling his motion for new trial.  Appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On December 22, 2014, Craig McCoy was living with Charles Benjamin at 902 Johnson Street located in Massillon, Ohio. He originally moved in about mid-November. Chelsea Smith moved into the home in mid-December with her three children, ages 10, 3 and 1. McCoy slept downstairs while the others slept upstairs. McCoy knew Appellant's father, Kip A. Pullin, by sight. McCoy knew "Big Kip" since 1990. McCoy also knew "Little Kip," the appellant.

{¶3}   On December 21, 2014, McCoy had gone to sleep downstairs. He was suddenly awakened around seven o'clock the next morning when he heard the back door to the residence "bust open." As McCoy got up to see what was going on, Appellant, who was wearing a hoodie, met him. McCoy did not recognize Appellant right away as he was immediately shot by him and was wounded in his right arm. McCoy nonetheless ran towards Appellant, grabbed him, and threw him to the ground. McCoy then struggled with Appellant, trying to get the handgun away from him. As he was fighting, McCoy realized his assailant was Appellant. McCoy then realized someone else was shooting at him from behind. In order to protect himself, McCoy tried to use Appellant as a shield. Many bullets were now being fired at him, and it was during this time McCoy realized Big

Kip was firing his handgun at him. McCoy also saw a third assailant, but he did not know him, only noticing this third man had a lump on his eye.

{¶4}    Appellant approached McCoy, who was lying on the floor, and shot him in the face. McCoy also suffered from gunshot wounds to his side and his leg, as well as the shots to his right arm. Leaving McCoy in a pool of his own blood, the three men ran out of the house.

{¶5}    Massillon Police Officer James Slutz arrived at the residence in response to a 9–1–1 call. He was met by Charles Benjamin at the front door and was told someone had been shot in his home. Officer Slutz found McCoy lying on the living room floor with Chelsea Smith tending to him. Officer Slutz asked McCoy who had shot him, and McCoy replied he did not know. Officer Slutz noticed McCoy was in pain and was holding his face. Officer Slutz also asked Smith who had done the shooting, and she replied they did not know. Both McCoy and Smith were short and brief with Officer Slutz. Massillon Police Detective David McConnell soon arrived at the scene and attempted to interview Benjamin, Smith, and McCoy. Smith appeared very nervous and frightened, and was not providing McConnell with much information. The detective noticed Benjamin, who was also very nervous and secretive, was whispering with Smith. McCoy also did not identify any of the shooters for McConnell. Other Massillon police officers noticed Smith was passive and rather quiet, while Benjamin was erratic, upset, and agitated.

{¶6}    McCoy admitted at trial he did not tell Detective McConnell who had shot him while he was at the scene. McCoy explained he was in shock because of what had just happened to him, and it all seemed like a dream to him.  Once the paramedics arrived, McCoy was immediately taken to the hospital. Detective McConnell eventually

followed McCoy to the hospital, where he attempted to speak with McCoy. McCoy did not offer who had shot him at this time. McConnell left his business card with McCoy's son, and told him to have his father contact him when he was in better condition to talk.

{¶7} The Massillon police processed the crime scene, taking photographs of the scene and of the evidence recovered. This evidence included spent shell casings and bullets, some of which were .25 caliber. A search of the house turned up no weapons.

{¶8} McCoy was subsequently discharged from the hospital on Christmas Day after being treated for his numerous gunshot wounds. McCoy went back to the same residence and had Smith contact McConnell the next day. When McConnell arrived, McCoy told the detective two of the three men who barged into the home and shot him were the Pullins. With this information, McConnell obtained arrest warrants for both men for the shooting.

{¶9} Later the same day, McCoy received a phone call from Benjamin's sister (Candice Benjamin), who lived in the neighborhood, as did the Pullins. Upon receiving this phone call, McCoy immediately called McConnell and told him the Pullins were walking in the neighborhood near Walnut and 14th Streets. McConnell immediately relayed this information over the radio, and Officer Slutz, who was on routine patrol at this time, received this dispatch call. Officer Slutz knew both men had been developed as suspects in the shooting of McCoy and there were now warrants for their arrest. As other police approached, Big Kip immediately surrendered. He was placed under arrest and a loaded .357 Magnum semiautomatic handgun was recovered from his waistband. Appellant, however, fled the scene and a chase ensued. Officer Sean Dadisman chased appellant through the neighborhood, losing him briefly after he jumped over a security

fence. Before reaching this fence, Officer Dadisman saw appellant throwing things away, which were later recovered and determined to be his cap, an aerosol can containing cash and drug paraphernalia, and a .45 caliber handgun. After getting around the fence, Officer Dadisman resumed the chase, eventually losing sight of him as Appellant ran between houses. Officer Joshua Edwards was searching the neighborhood for Appellant when he saw him walking towards him. Officer Edwards ordered Appellant to stop, but he replied he had already talked with the police in the area and he was good. Appellant continued walking and Officer Edwards emphatically ordered him to stop. Upon doing so, Appellant was placed under arrest.

{¶10} Appellant's cousin, Marquez Smith, also lived in this neighborhood and spotted the Pullins walking together. Smith had talked to Appellant a couple days earlier, after the shooting, and noticed Appellant had a scratch on his nose. Smith asked his cousin about it, and Appellant responded he got scratched while wrestling with someone. After this conversation, Smith later talked with Appellant on the phone, and Appellant told Smith he had shot McCoy. Smith was not sure if his cousin was just joking, but he nonetheless knew the police were searching for Appellant. Thus, when he noticed the Pullins walking and the police presence in the neighborhood, Smith opted to go into his house, as he did not want any trouble with the police. About fifteen minutes later, Appellant banged on his door, asking to be let him. Again, because of his own legal troubles, Smith did not want to get involved so he refused to open the door. He relented, however, and gave appellant different clothes to wear. Appellant changed into those clothes, leaving his pants on the porch. After Appellant left, Smith eventually went outside

onto his porch, and found a .25 caliber handgun in a pocket of Appellant's pants. He traded the gun to Philip Bledsoe in exchange for drugs.

{¶11} Later the same night, Detective McConnell received another phone call from McCoy. This time, McCoy told the detective Philip Bledsoe had come into possession of the gun Appellant used during the shooting. McConnell told him he would come there to retrieve it first thing next morning. When Detective McConnell arrived the next morning, McCoy was not home. Charles Benjamin, however, gave the .25 caliber Ravens Arms handgun to the detective.

{¶12} A ballistics expert from the Ohio Bureau of Criminal Identification & Investigation compared cartridges and bullets retrieved from the scene and McCoy. This expert could not confirm or deny the recovered cartridges were fired from the recovered .25 caliber handgun, mainly because of the particular characteristics of this handgun, which make comparison difficult. The expert, however, was able to conclude within a reasonable degree of scientific certainty two of the fired bullets which were recovered were fired from this handgun, to the exclusion of all other handguns in the world.

{¶13} Appellant was charged with one count of attempted murder with a firearm specification, one count of felonious assault with a firearm specification, and one count of carrying a concealed weapon. The case proceeded to jury trial in the Stark County Common Pleas Court.

{¶14} Chelsea Smith testified at trial she was awakened the morning of the shooting by the noise from the back door, followed shortly by gunshots. After the fight was over, she looked outside of her upstairs bedroom window and saw Appellant and two other men running away from the back door. One of these two other men could have

been Big Kip. Smith admitted she did not initially tell the police this information out of fear. However, once McCoy was released from the hospital, she opted to cooperate. After the Pullins were arrested, Smith and McCoy left the home for their own safety.

**{¶15}** Appellant was convicted of all charges. The trial court sentenced appellant on the charge of attempted murder to 10 years. On the firearm specification, appellant was sentenced to 3 years consecutive. The trial court merged the felonious assault charge with the attempted murder charge, and the firearm specification was merged with the previous firearm specification. The trial court sentenced appellant on the carrying concealed weapon charge to 12 months, consecutive, resulting in an aggregate sentence of 14 years. We affirmed the judgment on appeal to this Court. *State v. Pullin*, 5th Dist. Stark No. 2015CA00134, 2016-Ohio-1179.

**{¶16}** On November 8, 2017, Appellant filed a motion for new trial pursuant to Crim. R. 33(A)(6) on the grounds of newly discovered evidence. Attached to his motion was the affidavit of Phillip Jerome Bledsoe, who averred he visited McCoy after he was released from the hospital. McCoy told him someone tried to rob him. McCoy stated to Bledsoe he did not know who it was, but he was going to say it was Big Kip and his son because of something Big Kip did to him years ago.

**{¶17}** The trial court held an evidentiary hearing on the motion. Bledsoe testified McCoy told him he was going to blame Big Kip and Appellant for the shooting. He testified he was not aware McCoy had in fact blamed the Pullins until he was in jail. He admitted he made no effort to convey this information to anyone before trial, despite having been contacted by Det. McConnell and being subpoenaed to testify at Appellant's

trial. He testified all he said when he was brought from jail for Appellant's trial was, "This is B.S." Tr. 25. Bledsoe and Appellant are in the same prison, and see each other daily.

**{¶18}** Det. McConnell also testified at the hearing. He testified the Pullins were arrested four days after the shooting, and this information was common knowledge in Massillon. However, when he made contact with Bledsoe two months after the shooting, he did not relay the information given to him by McCoy. Det. McConnell further testified when Bledsoe was brought from the jail for Appellant's trial, Bledsoe stated he was not going to cooperate or talk to the detective.

**{¶19}** The trial court overruled the motion for new trial. The court found the motion was untimely. The court further found:

> The Court finds that Defendant has failed to demonstrate by clear and convincing evidence that Bledsoe's alleged testimony would change the result of a new trial. At trial, the victim in the case, Craig McCoy, as well as another eyewitness, Chelsea Smith, both identified Defendant as the shooter. In addition, the Court does not find Bledsoe's testimony persuasive. First, he refused to assist with the investigation leading up to trial, at which time he would have had a clear opportunity to exonerate Defendant. Instead, he has consistently refused to speak to officers about this incident. Mr. Bledsoe had the opportunity to contact Defendant's counsel, the Stark County Sheriff's Office, Massillon Police Department, or even the Court to advise them that there had been a miscarriage of justice

and provide the information that he knew about the shooting. He chose to do nothing.

Furthermore, Defendant's counsel did have the opportunity to speak with Bledsoe. His name was provided in discovery by the State of Ohio as a potential witness. At the evidentiary hearing, all parties and Mr. Bledsoe acknowledged that Defense counsel at no time contacted Mr. Bledsoe. Mr. Bledsoe's name appears frequently in the police report and in interviews that were turned over to defense counsel in discovery. Bledsoe was brought back from prison for the trial and all counsel had the opportunity to interview him.

**{¶20}** Judgment Entry, January 29, 2018.

**{¶21}** The court also noted according to Bledsoe's affidavit, Appellant's father was not involved in the shooting. However, "Big Kip" changed his plea to guilty during trial.

**{¶22}** It is from the January 29, 2018 judgment of the court overruling his motion for new trial Appellant prosecutes this appeal, assigning as error:

DID THE TRIAL COURT ABUSE ITS DISCRETION, DENYING A NEW TRIAL BASED UPON SUBSTANTIAL, MATERIAL, ENTERED NEW, UNDISCOVERABLE STATE WITNESS AFFIDAVIT, TESTIMONY, THAT THE TRIAL TRANSCRIPT RECORD EVIDENCE, NOT ONLY WAS UNDISCOVERABLE, BUT TRUE, EVIDENCING TWO STAR STATE WITNESSES IDENTITY TESTIMONY WAS INTENTIONAL [SIC] FALSE,

AND THE STATE KNEW "IT," INTENTIONALLY DECEIVING THE JURY AND WITH DEFENDANT DUE PROCESS RIGHTS TO A FAIR TRIAL, VIOLATED IN THE PROCESS?

**{¶23}** Crim. R. 33 governs motions for new trial and provides in pertinent part:

**(A) Grounds.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

**(B) Motion for New Trial; Form, Time.** Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was

unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.

Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

**{¶24}** Although not timely filed, the trial court granted Appellant leave to file a motion for new trial on November 1, 2017.

**{¶25}** To warrant the granting of a motion for a new trial in a criminal case based on newly discovered evidence, the defendant must show the new evidence (1) discloses a strong probability it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370, syllabus (1947).

{¶26} The decision whether to grant or deny a motion for a new trial is committed to the sound discretion of the trial court. *See State v. LaMar*, 95 Ohio St.3d 181, 201, 767 N.E.2d 166 (2002); *State v. Williams*, 43 Ohio St.2d 88, 330 N.E.2d 891 (1975), paragraph two of the syllabus. Thus, we will not reverse a trial court's denial of a motion for a new trial absent an abuse of discretion. *LaMar*, 95 Ohio St.3d at 201, 767 N.E.2d 166. An abuse of discretion is more than an error in judgment; instead, it implies a court's ruling is unreasonable, arbitrary, or unconscionable*. See, e.g., Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶27} We find the trial court did not abuse its discretion in finding Appellant failed to demonstrate a strong probability Bledsoe's testimony would change the result if a new trial is granted. Bledsoe testified McCoy told him shortly after his discharge he planned to tell police Appellant and his father committed the shooting although he did not know who committed the shooting. However, Bledsoe failed to disclose this information to the authorities despite having multiple opportunities to do so, including when he was brought from the jail during Appellant's trial. Rather, he kept this information to himself until he began seeing Appellant daily at the jail. Further, his testimony was McCoy planned to wrongfully pin the crime on Appellant and his father. Appellant's father entered a guilty plea, admitting to his role in the shooting, which undermines Bledsoe's claim McCoy fabricated the story of the involvement of "Big Kip" and Appellant in the crimes.

{¶28} Further, in our opinion on Appellant's direct appeal, we found evidence other than McCoy's testimony supported the jury's verdict of conviction:

In the case at bar, McCoy testified that appellant shot him. (1T. at 151–155). Marques Smith testified that appellant admitted to shooting McCoy. (1T. at 192). Appellant asked Smith for a change of clothes and left the .25 caliber handgun on Smith's porch with his clothing. (1T. at 196–197). Evidence was presented during appellant's jury trial that two of the fired .25 caliber bullets found at the home on the night of the attack were fired from this gun. (2T. at 391–392). Officer Sean Dadisman chased appellant and observed him throw a loaded .45 caliber handgun from his person. (1T. at 260; 272–273).

**{¶29}**  *Pullin, supra,* ¶ 28.

**{¶30}**  In addition, we find the court did not abuse its discretion in finding the evidence is not such as in the exercise of due diligence could not have been discovered before trial.  Defense counsel had the opportunity to speak with Bledsoe, as his name was provided in discovery by the State of Ohio as a potential witness.  In addition, Bledsoe's name appears frequently in the police report and in interviews provided to defense counsel in discovery.  Bledsoe was brought back from prison for the trial and all counsel had the opportunity to interview him.

**{¶31}**  We find no abuse of discretion in the judgment overruling Appellant's motion for new trial.

**{¶32}** The assignment of error is overruled.  The judgment of the Stark County Common Pleas Court is affirmed.  Cost are assessed to Appellant.

By: Hoffman, J.

Gwin, P.J.  and

Baldwin, J. concur